UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CALIFORNIA ASSOCIATION OF REALTORS, INC.,
    Plaintiff and Counterclaim Defendant,

    v.                                    CIVIL ACTION NO.
                                          16-11021-IT
PDFFILLER, INC., VADIM YASINOVSKY,
and BORIS SHAKHNOVICH,
    Defendants.


PDFFILLER, INC.,
    Third-Party Plaintiff,

    v.


CALIFORNIA ASSOCIATION OF REALTORS, INC.,
    Plaintiff and Counterclaim Defendant, and

REAL ESTATE BUSINESS SERVICES, INC.
and RE FORMSNET,LLC d/b/a ZIPLOGIX, LLC,
    Third-Party Defendants.

**REPORT AND RECOMMENDATION RE:**
**COUNTERCLAIM-DEFENDANT CALIFORNIA ASSOCIATION OF REALTORS,**
**INC.'S MOTION TO DISMISS AMENDED COUNTERCLAIMS AND AMENDED**
**THIRD-PARTY COMPLAINT OF PDFFILLER, INC. (DOCKET ENTRY # 121);**
**DEFENDANTS' PARTIAL MOTION FOR JUDGMENT ON THE PLEADINGS**
**(DOCKET ENTRY # 141)**


**March 2, 2018**


**BOWLER, U.S.M.J.**

     In this action, plaintiff and counterclaim defendant

California Association of Realtors, Inc. ("CAR") sued defendants

PDFfiller, Inc., Vadim Yasinovsky, and Boris Shakhnovich

("defendants") for copyright infringement under 17 U.S.C. §

501(a), trademark infringement under 15 U.S.C. §§ 1125(a)(1) and

1114(1), violation of the Digital Millennium Copyright Act

("DMCA"), 17 U.S.C § 1201(a), and violation of Massachusetts General Laws chapter 93A ("chapter 93A"), sections two and 11 ("section 11").  CAR alleges that defendants reproduce and sell unauthorized copies of CAR's works.  (Docket Entry # 1).  The works at issue purportedly bear CAR's trade name and logo, which are registered trademarks belonging to CAR and copyrighted. (Docket Entry # 1).

Defendant and third-party plaintiff PDFfiller, Inc. ("PDFfiller") brought an amended third-party complaint ("the third-party complaint") for antitrust violations under the Sherman Act, 15 U.S.C. § 2, against third-party defendant Real Estate Business Services, Inc. ("REBS") and third-party defendant RE FormsNet, LLC d/b/a zipLogix™ ("zipLogix"). (Docket Entry # 101).  PDFfiller also brought amended counterclaims ("the counterclaims") for similar antitrust violations under the Sherman Act, 15 U.S.C. § 2, against CAR, REBS, and zipLogix ("the CAR Parties").  (Docket Entry # 100).

Pending before this court is a motion filed by the CAR Parties to dismiss the counterclaims (Docket Entry # 100) and the third-party complaint (Docket Entry # 101) pursuant to Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)").  (Docket Entry # 121). PDFfiller opposes the motion.  (Docket Entry # 123).

Also pending before this court is a motion for judgment on the pleadings filed by defendants to dismiss with prejudice

CAR's chapter 93A claim pursuant to Fed. R. Civ. P 12(c) ("Rule 12(c)"). (Docket Entry # 141). CAR opposes the motion. (Docket Entry # 153). After conducting a hearing on January 10, 2018, this court took the motions (Docket Entry ## 121, 141) under advisement.

PROCEDURAL HISTORY

The complaint filed by CAR sets out the following causes of action: (1) copyright infringement under the United States Copyright Act, 17 U.S.C § 501(a); (2) trademark infringement under the Lanham Act, 15 U.S.C § 1125(a)(1); (3) violation of the DMCA, 17 U.S.C § 1201(a); and (4) violation of chapter 93A, sections two and 11. (Docket Entry # 1). In the counterclaims against the CAR Parties and the third-party complaint against REBS and zipLogix, PDFfiller alleges: (1) unlawful tying in violation of the Sherman Act, 15, U.S.C. § 2; (2) monopolization in violation of the Sherman Act, 15 U.S.C. § 2; and (3) attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2. (Docket Entry ## 100, 101).

I.  The CAR Parties' Rule 12(b)(6) Motion

As previously noted, the CAR parties move to dismiss PDFfiller's Sherman Act claims for unlawful tying, monopolization, or attempted monopolization. To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain 'enough facts to state a claim to relief that is plausible on its face'"

even if actual proof of the facts is improbable.  Bell Atlantic
v. Twombly, 550 U.S. 544, 556, 570 (2007); Miller v. Town of
Wenham Massachusetts, 833 F.3d 46, 51 (1st Cir. 2016).  The
"standard is 'not akin to a probability' requirement," but it
requires "'more than a sheer possibility that a defendant has
acted unlawfully.'"  Saldivar v. Racine, 818 F.3d 14, 18 (1st
Cir. 2016); Feliciano-Hernández v. Pereira-Castillo, 663 F.3d
527, 533 (1st Cir. 2011).  "[A]ll reasonable inferences" are
drawn "in the pleader's favor."  Sanders v. Phoenix Ins. Co.,
843 F.3d 37 (1st Cir. 2016).  Legal conclusions in the complaint
are not part of the Rule 12(b)(6) record.  See In re Ariad
Pharmacy, Inc. Securities Litigation, 842 F.3d 744, 750 (1st
Cir. 2016).  Facts are confined to those in the counterclaims
and the third-party complaint supplemented by matters of public
record and facts susceptible to judicial notice.  See Butler v.
Balolia, 736 F.3d 609, 611 (1st Cir. 2013) (supplementing facts
in complaint "by examining 'documents incorporated by reference
into the complaint, matters of public record, and facts
susceptible to judicial notice'").

"[W]hile there are no special pleading requirements for
antitrust claims . . . invocation of antitrust terms of art does
not confer immunity from a motion to dismiss."  Boston
Scientific Corp. v. Schneider (Europe) AG, 983 F.Supp. 245, 253
(D. Mass. 1997).  That being said, "[i]n antitrust cases,

'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'"   In re Asacol Antitrust Litig., 233 F.Supp.3d 247, 254 (D. Mass. 2017) (citing Meijer, Inc. v. Ranbaxy Inc., Civil Action No. 15-11828-NMG, 2016 WL 4697331, at *8 (D. Mass. Sept. 7, 2016)) (quoting Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 746 (1976)).

FACTUAL BACKGROUND

PDFfiller is a Massachusetts corporation with a principal place of business in Massachusetts.  (Docket Entry # 100, p. 23) (Docket Entry # 101, p. 3).[1]  CAR is a "California not-for-profit trade association" and its principal place of business is located in California.  (Docket Entry # 100, p. 23).  REBS is a California corporation also with a principal place of business in California.  (Docket Entry # 100, p. 23) (Docket Entry # 101, p. 3).  REBS is a "wholly-owned for-profit subsidiary of CAR." (Docket Entry # 100, p. 23) (Docket Entry # 101, p. 4). [Z]ipLogix is a "Delaware limited liability company" and its principal place of business is located in Michigan.  (Docket Entry # 100, p. 23) (Docket Entry # 101, p. 4).

PDFfiller provides a "paperless transaction management system through the PDFfiller Website" ("PTM").  (Docket Entry # 100, p. 23) (Docket Entry # 101, p. 2).  The PTM system "allows

---

[1]  Page numbers refer to the page as docketed as opposed to the page number of the document itself.

users to fill, edit, and modify electronic fillable forms, including EFRE." (Docket Entry # 100, p. 23) (Docket Entry # 101, p. 2). CAR is a producer of electronic fillable real estate forms, and specifically produces EFREs "for use in California."[2] (Docket Entry # 100, p. 21) (Docket Entry # 101, p. 2). PDFfiller's PTM Software is designed to edit and manage the same type of electronic fillable real estate form. (Docket Entry # 100, pp. 21-22). CAR devotes "significant resources to ensuring that its California EFRE remain up-to-date and compliant with relevant law." (Docket Entry # 100, p. 21) (Docket Entry # 101, p. 2). Specifically, CAR expends "considerable" resources "to continually revise, improve, and update the CAR Library to ensure that its works remain current with the myriad of legal and policy changes affecting the California real estate services industry." (Docket Entry ## 100, pp. 21, 25) (Docket Entry # 101, p. 6).

CAR members are able to access CAR's EFRE[3] through a library ("the CAR Library") as a resulting benefit of their CAR membership. (Docket Entry # 100, p. 21) (Docket Entry # 101, p. 2). CAR EFRE can be edited using PTM Software that is

---

[2] Electronic real estate forms used in California will be referred to hereinafter as "California EFREs."

[3] "CAR EFRE" refers to the California EFRE produced by CAR. When CAR EFRE or CAR's EFRE is referenced, the reference is to California EFRE produced by CAR.

comparable to PTM Software provided by PDFfiller.  (Docket Entry # 100, p. 21) (Docket Entry # 101, p. 2).

PDFfiller's PTM Software is available through the PDFfiller website and, as noted above, it "allows users to fill, edit, manage, sign, and send a variety of electronic forms online." (Docket Entry # 100, p. 21) (Docket Entry # 101, p. 2).  CAR, however, requires users to manage and edit CAR EFRE "only with 'zipForm®,' which is a real estate PTM Software offered for sale by zipLogix."  (Docket Entry 100, p. 22) (Docket Entry # 101, p. 3).  [Z]ipLogix is "majority-owned and managed" by CAR's wholly-owned subsidiary, REBS.  (Docket Entry # 100, p. 22) (Docket Entry # 101, p. 2).

[Z]ipForm products include, but are not limited to, "zipForm Plus, zipForm Standard, and any other zipForm product sold, provided by, or otherwise offered by the CAR Parties that allows users to fill, edit, and sign EFRE."  (Docket Entry # 100, p. 22) (Docket Entry # 101, p. 3).  [Z]ipForm is "considerably more expensive than competitors' products," including products offered by PDFfiller.  (Docket Entry # 100, p. 22) (Docket Entry # 101, p. 3).  Additionally, when a non-CAR real estate professional "attempts to purchase a CAR EFRE online via CAR's website," he or she must also purchase zipForm. (Docket Entry # 100, pp. 22, 25) (Docket Entry # 101, pp. 3, 5). When non-member users click on the link to purchase zipForm, he

or she is led "back to the zipLogix e-commerce website to create
a zipLogix account and proceed with purchasing zipForm."
(Docket Entry # 100, p. 25) (Docket Entry # 101, p. 5).

Real estate attorneys are able to "create a document
similar to CAR EFRE." (Docket Entry # 100, p. 26) (Docket Entry
# 101, p. 6). The use of real estate attorneys to create this
type of document, however, is "significantly more expensive than
EFRE" since EFREs are provided to CAR members for free. (Docket
Entry # 100, p. 26) (Docket Entry # 101, p. 6). Further, EFREs
maintain several "unique" features compared to other types of
real estate forms, such as paper forms. (Docket Entry # 100, p.
26) (Docket Entry # 101, pp. 6-7). Some of these features
include: the ability to easily change and edit EFREs; EFREs,
combined with "search functionality," speed up the "process of
reviewing and revising documents"; EFREs' format allows them "to
be stored and retrieved without the significant storage fees
typically endured in relation to the storage of a large number
of paper real estate documents"; they minimize the risk of
losing forms; it is easy and inexpensive to transfer EFREs, as
they can be transferred by e-mail, which in turn "increases real
estate transaction efficiency by simplifying the transmission of
real estate forms between real estate professionals and their
clients." (Docket Entry # 100, p. 26) (Docket Entry # 101, p.
7).

The electronic design of California EFRE "necessitate[es] software that is capable of filling, editing, managing, signing, and sending these types of forms – precisely what PTM Software is made to do." (Docket Entry # 100, p. 26) (Docket Entry # 101, p. 7). In addition, e-signatures allow "users to sign forms without having to print them out, and in some instances these signatures can be encrypted to remove doubts as to their authenticity." (Docket Entry # 100, p. 27) (Docket Entry # 101, pp. 7-8). California EFRE also allows for greater security measures, such as "two-factor" authentication, for payments to be linked to the forms and for an increase in overall efficiency for real estate professionals. (Docket Entry # 100, p. 27) (Docket Entry # 101, p. 8).

While PTM Software is needed to "obtain the full benefit of [an] EFRE," various types of PTM Software can be used to manage EFRE. (Docket Entry # 100, p. 27) (Docket Entry # 101, p. 8). Some consumers "frequently seek out non-Car PTM Software to edit CAR EFRE" from PTM Software providers like Dotloop, Instanet Solutions, and PDFfiller. (Docket Entry # 100, p. 27) (Docket Entry # 101, p. 8). Moreover, some California competitors offer EFRE and PTM Software products separately, rather than bundling the two products as CAR does with its EFRE and zipLogix's

zipForm.[4]   (Docket Entry # 100, p. 27) (Docket Entry # 101, p. 8).

Moreover, "CAR EFRE has a market share of approximately 90% of all EFRE in California" and CAR describes its products "as 'the standard forms used in nearly every transaction in California.'" (Docket Entry # 100, p. 27) (Docket Entry # 101, p. 8).  CAR EFRE forms and zipForm software are provided to members as a benefit[5] and CAR memberships are obtained "by joining a local REALTOR® affiliate." (Docket Entry # 100, p. 27) (Docket Entry # 101, p. 8).

Membership costs vary "by affiliate, but total membership fees are in excess of $600 per year." (Docket Entry # 100, p. 28) (Docket Entry # 101, p. 8).  Non-members must purchase zipForm before they are able to purchase CAR's ERFE and the most basic version of zipForm "costs $849 for an annual license." (Docket Entry # 100, p. 28) (Docket Entry # 101, p. 8). Therefore, it costs between $600 and $849 per year for non-

---

[4]  As noted previously, zipForm is a type of PTM Software that is offered for sale by zipLogix.  (Docket Entry # 100-22) (Docket Entry # 101).

[5]  Assuming dubitánte that it is appropriate to consider an admission in a prior pleading in the context of a Rule 12(b)(6) motion, compare Sulton v. Wright, 265 F.Supp.2d 292, 295 (S.D.N.Y. 2003), with In re PXRE Grp., Ltd., Secs. Litig., 600 F.Supp.2d 510, 525 (S.D.N.Y. 2009); see also TufAmerica, Inc. v. Diamond, 968 F.Supp.2d 588, 600 (S.D.N.Y. 2013), the added fact that CAR did not charge an "additional fee" for the benefit (Docket Entry # 32, p. 27) (emphasis added) does not alter this court's recommendation.

members to access CAR EFRE.  (Docket Entry # 100, p. 28) (Docket Entry # 101, p. 8).  In contrast, a number of competitors of CAR, such as PDFfiller, offer PTM Software that is comparable to zipForm for prices as low as $72 per year.  Other competitors even offer their most basic PTM Software for free.  (Docket Entry # 100, p. 28) (Docket Entry # 101, pp. 8-9).  Because CAR only allows users to manage CAR EFRE with zipForm PTM Software, however, users cannot use these cheaper alternatives provided by competitors.  (Docket Entry # 100, p. 22) (Docket Entry # 101, p. 9).

REBS[6] "is licensed to sell CAR EFRE to non-CAR members for the benefit of CAR."  (Docket Entry # 100, p. 28) (Docket Entry # 101).  In general, however, CAR "does not license the use of its EFRE in California to third parties."  (Docket Entry # 100, p. 28) (Docket Entry # 101, p. 9).  Thus, consumers must "either join a REALTOR® affiliate or purchase a zipForm® subscription" if they wish to buy a CAR EFRE.  (Docket Entry # 100, p. 28) (Docket Entry # 101, p. 9).  Either option of joining a REALTOR® affiliate or purchasing a zipForm® subscription is "significantly more expensive than CAR's competitors in the California EFRE market, and both options are conditioned on the purchase and use of zipForm®."  (Docket Entry # 100, p. 28)

---

[6]  As previously mentioned, REBS is a wholly-owned subsidiary of CAR.  (Docket Entry # 100, p. 22) (Docket Entry # 101).

(Docket Entry # 101, p. 9). A "considerable number of consumers" have expressed frustration because they are unable to use a PTM Software other than zipForm to edit CAR EFRE. (Docket Entry 100, p. 31) (Docket Entry # 101, p. 11). Additionally, some consumers of zipForm complain that the "software has compatibility issues with mobile devices and occasionally requires forms to be printed in order to be completed." (Docket Entry # 100, p. 31) (Docket Entry # 101, 11).

Finally, on several occasions, CAR engaged in legal disputes over CAR's copyright policy.[7] (Docket Entry # 100, p. 29) (Docket Entry # 101, p. 10). CAR's copyright policy prohibits the "printing [of] blank CAR EFRE from zipForm®, or placing CAR EFRE in any PTM Software other than zipForm®." (Docket Entry # 100, p. 29) (Docket Entry # 101, p. 10). "[O]n information and belief, CAR is encouraging or asking its sister state realtor associations to sue PDFfiller." (Docket Entry 100, p. 30) (Docket Entry # 101, p. 11). The Texas Association of Realtors, Inc. ("TAR") "sent a cease-and-desist letter to and

---

[7]  PDFfiller cites to California Association of Realtors v. Zachery Childress, et al., Case No. 8:11-cv-304, 8:11-cv-1553 (C.D. Cal. 2011); California Association of Realtors v. Commerce Inn Inc., Case No. 2:02-cv-251 (C.D. Cal. 2002); California Association of Realtors v. Equisource Real Estate Inc., et al., Case No. 2:01-cv-01603 (C.D. Cal. 2001 ), to demonstrate current instances where CAR "has threatened and instituted lawsuits against non-CAR real estate professionals that use CAR EFRE without permission by claiming alleged copyright protection." (Docket Entry # 100, p. 29) (Docket Entry # 101, p. 10).

filed suit against PDFfiller, making essentially the same allegations as CAR in the present litigation." (Docket Entry # 100, p. 30) (Docket Entry # 101, p. 11). Similar to CAR, TAR owns an interest in zipForm. (Docket Entry # 100, p. 30) (Docket Entry # 101, p. 11).

DISCUSSION

A. <u>Antitrust Claims:  Unlawful Tying; Monopolization; and Attempted Monopolization</u>

The Sherman Act was created "to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." <u>Northern Pacific Railway Co. v. United States</u>, 356 U.S. 1, 4 (1958).  To maintain the fundamental liberties of competition, the Sherman Act "prohibits '[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States.'"  <u>Id.</u>; 15 U.S.C. § 1.  "Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition." <u>Northern Pacific Railway Co.</u>, 356 U.S. at 5.  Section two of the Sherman Act "holds liable 'every person who shall monopolize, or attempt to monopolize, or combine or conspire to monopolize . . . any part of the trade or commerce among the several States.'" <u>Boston Scientific Corp.</u>, 983 F.Supp. at 268; 15 U.S.C. § 2.

The CAR Parties first contend that PDFfiller has not sufficiently defined the relevant product markets to satisfy any of PDFfiller's antitrust claims and, as such, all of the antitrust claims should be dismissed.  Specifically, the CAR Parties suggest that California EFRE and PTM Software for California are incorrect tying and tied product markets, respectively.  (Docket Entry # 122) (Docket Entry # 127).  The CAR Parties further maintain that even if PDFfiller properly defined the relevant product markets, PDFfiller's unlawful tying claim[8] is still subject to dismissal because PDFfiller incorrectly considered California EFRE and California PTM Software as two separate products.  (Docket Entry # 122, p. 15) (Docket Entry # 127, p. 5).  Additionally, the CAR Parties argue that PDFfiller fails to plead sufficient facts to demonstrate the CAR Parties' market power in the alleged tying market, and also that PDFfiller's monopoly and attempted monopoly claims fail because PDFfiller has not pled wrongful or anticompetitive conduct by the CAR Parties, nor have they pled any antitrust injury.  (Docket Entry # 122) (Docket Entry # 127).

---

[8]  A tying arrangement "may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." Northern Pacific Railway Co., 356 U.S. at 5–6.

Conversely, PDFfiller maintains that at this stage in the proceedings, it pled a factually detailed, legally sound basis for its allegations of the relevant tying and tied product markets.  (Docket Entry # 123, p. 6).  Additionally, PDFfiller argues that it not only pled sufficient facts to satisfy an unlawful tying claim using either a per se or rule of reason standard, but it also pled sufficient facts to show that the tying and tied products are separate products as well as sufficient facts to show the CAR Parties' market power  (Docket Entry # 123).  Finally, PDFfiller argues that its allegations of the CAR Parties' sham litigation demonstrate the CAR Parties' wrongful or anticompetitive conduct and this same conduct resulted in PDFfiller's antitrust injury.  (Docket Entry ## 123, pp. 20-21).

1.  Relevant Markets for Antitrust Claims

Turning to the relevant market argument, the CAR Parties maintain that the first criterion for all of PDFfiller's antitrust claims is to define the relevant markets.  As set out in the counterclaims and the third-party complaint, PDFfiller defines the relevant tying market as California EFRE and the relevant tied product market as PTM Software for California EFRE.  (Docket Entry # 100, pp. 25-26) (Docket Entry # 101, p. 6).  The CAR Parties argue that naming California EFRE as the tying product market "excludes obvious substitute products" that

"serve the same purpose as California EFRE." (Docket Entry # 122) (Docket Entry # 127). Additionally, the CAR Parties argue that naming PTM Software for California EFRE as the tied product market excludes possible substitutes and that PDFfiller provides no support for "why the relevant market should be PTM Software for California EFRE rather than PTM Software in general." (Docket Entry # 122, p. 18) (Docket Entry # 127, pp. 4-5). In response, PDFfiller maintains that the relevant tying and tied markets are properly defined, noting that these markets do not exclude reasonable substitute products. (Docket Entry # 123, p. 10).

All parties agree that the standard used to determine a relevant product market is a "reasonable interchangeability" standard; specifically, the determination of a relevant product market depends on "an analysis of the interchangeability of use" or rather, that a relevant product market "includes all goods that are reasonably interchangeable with each other." (Docket Entry # 122, p. 16) (Docket Entry # 123, p. 8). Each party, however, defines reasonable interchangeability differently. The CAR Parties suggest that reasonable interchangeability is determined by an equivalence test and that a relevant product market includes all products that serve the same purpose as each other. (Docket Entry # 122, pp. 16-17). PDFfiller suggests that reasonable interchangeability is determined instead by "the

cross-elasticity of demand for the product in question – the extent to which purchasers will accept substitute products in instances of price fluctuation and other changes." (Docket Entry # 123).

For antitrust purposes, the "definition of the relevant market is ordinarily a question of fact." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016). There are two components that comprise the relevant market, the first being the relevant *geographic* market, and the second being the relevant *product* market. Id. "In general, the relevant geographic market consists of the *geographic area in which the defendan*t *faces competitio*n and to which consumers can practically turn *for alternative sources of the product*." Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996) (emphasis added with internal citations omitted). The geographic market is relatively self-evident, whereas the product market demands a more complex analysis. Flovac, 817 F.3d at 853.

A relevant product market is "made up of 'commodities reasonably interchangeable by consumers for the same purposes.'" In re Nexium (Esomeprazole) Antitrust Litig., 968 F.Supp.2d 367, 387 (D. Mass. 2013) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956)). For a relevant product market to survive a Rule 12(b)(6) motion to dismiss, the

CAR Parties aptly note that, "[A]n alleged product must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the *interchangeability of use* or *the cross-elasticity of demand*, and it must be plausible." Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 237-38 (2d Cir. 2008) (emphasis added).  As also correctly noted by PDFfiller:

> The reasonable interchangeability of a set of products is not dependent on the similarity of their forms or functions; instead, "Such limits are drawn according to the cross-elasticity of demand for the product in question-the extent to such purchasers will accept substitute products in instances of price fluctuation and other changes."

In re Nexium (Esomeprazole) Antitrust Litig., 968 F.Supp.2d at 387-88 (quoting George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547, 552 (1st Cir. 1974)).  Thus, as explained by the Third Circuit in Queen City Pizza:

> [W]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997).

Although reasonable interchangeability need not focus solely on similar form and function of possible substitute

products, George R. Whitten, 508 F.2d at 552, the determination

of the interchangeability of products is a fact-intensive

process.  See Eastman Kodak, 504 U.S. at 482 ("in most cases,

proper market definition can be determined only after a factual

inquiry into the commercial realities faced by consumers").

Here, at this stage in the pleadings, however, "courts hesitate

to grant motions to dismiss for failure to plead a relevant

product market" due to the "deeply fact-intensive" nature of the

inquiry.  Todd v. Exxon Corp., 275 F.3d 191, 199–200 (2d Cir.

2001).  The Second Circuit in Todd further explains that:

> Cases in which dismissal on the pleadings is appropriate
> frequently involve either (1) failed attempts to limit a
> product market to a single brand, franchise, institution,
> or comparable entity that competes with potential
> substitutes or (2) failure even to attempt a plausible
> explanation as to why a market should be limited in a
> particular way.

Todd, 275 F.3d. at 200.  Thus, Todd instructs that, "it is

sufficient that plaintiff has alleged specific facts that

support a narrow product market in a way that is plausible and

bears a rational relation to the methodology courts prescribe to

define a market for antitrust purposes."  Id. at 203.

A determination of reasonable interchangeability using an

equivalence test is based on "whether the substituted element in

the accused device performs substantially the same function, in

substantially the same way, to produce substantially the same

result as the claimed element."  Boston Scientific Corp., 983

F.Supp. at 261 (internal citations omitted).  The Federal
Circuit notes, however, that this type of test "goes too far . .
. to describe the function-way-result test as 'the' test for
equivalency" and that, "[a]s technology becomes more
sophisticated, and the innovative process more complex, the
function-way-result test may not invariably suffice to show the
substantiality of the differences."  Id. at 261 (internal
citations omitted); see, e.g., In re Nexium (Esomeprazole)
Antitrust Litig., 968 F.Supp. at 367, 388 ("Although it may be
beyond this Court's competence to confirm the accuracy of the
Direct Purchasers' characterization of the reasonable
interchangeability of brand Nexium with other drugs, such a
factually intensive determination is better left for resolution
by a jury.").

        Turning to the task, in the counterclaims and the third-
party complaint, PDFfiller suggests that the relevant geographic
market is EFRE in California.  (Docket Entry # 100, p. 26)
(Docket Entry # 101, p. 6).  The pleadings specifically note
that "real estate laws vary significantly by state and a
consumer of EFRE is unlikely to have sufficient knowledge of the
difference between different states' laws to efficiently adapt
an out-of-state EFRE so that it is suitable for use in
California."  (Docket Entry # 100, p. 26) (Docket Entry # 101,
p. 6).  The aforementioned allegations render it plausible that

EFRE, specifically in California, is a plausible geographic
market for the tying product.  It is reasonable to define
California as the relevant geographic market particularly
because, as PDFfiller alleges, real estate laws are unique to
each state and EFRE deals explicitly with real estate laws.
Moreover, based on the state-by-state peculiarity of real estate
laws, the pleadings allow for a reasonable inference that the
geographic area in which the CAR Parties face competition is
California, as it is the area which consumers can turn for
alternative sources of PTM Software to edit EFRE for California.
Construing the facts in PDFfiller's favor, the alleged relevant
geographic market in the pleadings is plausible.

     Moving to the relevant product market, under either an
equivalence analysis or a cross-elasticity demand analysis, the
antitrust claims survive the Rule 12(b)(6) challenge.  PDFfiller
provides a reasonable basis not to broaden the product market
from California electronic real estate forms to include non-
electronic forms, namely paper forms created by attorneys or
standard paper forms provided by a real estate professional.
Thus, as stated in the counterclaims and the third-party
complaint:  real estate professionals are not reasonable
substitutes for EFRE because it takes "considerable amounts of
time and money . . . to continually revise, improve and update
the CAR Library to ensure that its works remain current with the

myriad of legal and policy changes affecting the California real
estate industry"; real estate attorneys are also not reasonable
substitutes because it would be significantly more expensive to
use a real estate attorney "to create a document similar to CAR
EFRE," and also because "attorneys themselves are consumers of
EFRE"; and paper is not a reasonable substitute because, unlike
paper forms, electronic forms can be changed easily, increase
the efficiency of reviewing and revising documents, do not incur
storage fees, and provide a low cost of transferring electronic
forms.  (Docket Entry # 100, pp. 25-26) (Docket Entry # 101, p.
7).

Here, PDFfiller pled adequate facts to demonstrate that
under either interpretation of reasonable interchangeability, it
is plausible that California EFRE is a relevant product market.
Specifically, PDFfiller's allegations of "product performance
differences" with non-electronic California real estate forms,
"lack of interchangeability with other [non-electronic
California real estate] products, and significant price
differences between California EFRE and those other products"
are sufficient to state a plausible product market consisting of
electronic real estate forms in California.  (Docket Entry #
123, p. 9).  Whether this market definition adheres at trial or
at summary judgment is not before this court.  Additionally,
PDFfiller's allegations render it plausible that the products

the CAR Parties suggest as reasonable substitute products for
California EFRE because they "serve the same purpose as
California EFRE – preparation of real estate contracts – and are
put to the same use" are not reasonable substitutes because
PDFfiller provides ample support for its claim as to why these
alternatives (attorneys, paper forms, and real estate
professionals) either do not serve the same purpose or are not
put to the same use.  In particular, PDFfiller's allegations
regarding the increased expense and time-consuming nature of the
non-electronic products render it plausible that California EFRE
provides an appropriate tying product market, at least for
purposes of a Rule 12(b)(6) challenge.

    In short, the relevant product market is a deeply fact-
intensive process and it is necessary that the pleader
adequately assert facts to demonstrate that the stated relevant
market is plausible.  Here, the counterclaims and the third-
party complaint are sufficient to render California electronic
real estate forms a plausible market.  The antitrust claims
therefore survive the 12(b)(6) challenge to the alleged relevant
market because the pleadings set out a plausible relevant
product market.

2.  Per Se Unlawful Tying

    The CAR Parties next maintain that PDFfiller's unlawful
tying claim is subject to dismissal because PDFfiller fails to

demonstrate the existence of separate product demand for the tying and the tied products.  (Docket Entry # 122, p. 18) (Docket Entry # 127, p. 5).  The CAR Parties contend that there is no separate demand for the tied product.  More specifically, they submit "there is no plausible basis to believe a consumer would purchase EFRE without also purchasing or obtaining the necessary software, or buy the software but not the EFRE." (Docket Entry # 122, p. 19) (Docket Entry # 127, p. 5).  The CAR Parties argue that, because California EFRE cannot be used without some type of PTM Software, they cannot be considered separate products.  The CAR Parties explain that California EFRE is "useless" without PTM Software and there is no "plausible demand for PTM Software for California EFRE without the California EFRE."  (Docket Entry 122, p. 20) (Docket Entry # 127, p. 5).

PDFfiller, on the other hand, asserts that, because "there is consumer demand to use CAR EFRE on platforms other than zipForm, and that other providers of California EFRE do not bundle it with PTM Software," it has shown that "demand for California EFRE, the tying product, is not strongly correlated with the demand for the tied product, PTM Software for California EFRE."  (Docket Entry # 123, p. 13).  Thus, PDFfiller maintains that California EFRE and PTM Software for California are separate products because any variation of PTM Software can

be used to edit California EFRE.[9]  PDFfiller also argues that PTM
Software for California, the alleged tied product, can be used
to edit different electronic forms other than California EFRE
and other providers of California EFRE do not bundle EFRE with
PTM Software.  (Docket Entry # 123, p. 14).  According to
PDFfiller, these characteristics establish a separate demand and
therefore a separate product market for PTM Software for
California from California EFRE.

Courts have "long recognized that 'certain tying
arrangements pose an unacceptable risk of stifling competition
and therefore are unreasonable "per se".'"  Lee v. Life Ins. Co.
of N. Am., 829 F.Supp. 529, 536 (D.R.I. 1993) (quoting Jefferson
Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 9 (1984),
abrogated on other grounds by Illinois Tool Works Inc. v. Indep.
Ink, Inc., 547 U.S. 28 (2006)).  The most important per se
categories are "naked horizontal price-fixing, market
allocation, and output restrictions."  Stop & Shop Supermarket
Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st

---

[9]  This is an area of dispute because, as alleged in the amended
counterclaim and third-party complaint, any general PTM Software
can be used to edit California EFRE.  The CAR Parties argue,
however, that this is not true because CAR's copyright policy
allegedly restricts any electronic manipulation of CAR's
California EFRE forms using software other than zipForm.
(Docket Entry # 100, pp. 26-29) (Docket Entry # 122, p. 8).

Cir. 2004).  The four elements of a per se tying claim are as follows:

> (1) the tying and the tied products are actually two distinct products; (2) there is an agreement or condition, express or implied, that establishes a tie; (3) the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and (4) the tie forecloses a substantial amount of commerce in the market for the tied product.

CCBN.Com, Inc. v. Thomson Fin., Inc., 270 F.Supp.2d 146, 154 (D. Mass. 2003) (citing Borschow Hospital and Medical Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 17 (1st Cir. 1996) (citations omitted)); see also AVX Corp. v. Cabot Corp., 600 F.Supp.2d 286, 288–89 (D. Mass. 2009) (quoting Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1178–79 (1st Cir. 1994), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010)); BookLocker.com, Inc. v. Amazon.com, Inc., 650 F.Supp 2d 89, 96 (D. Me. 2009).  "[E]very refusal to sell two products separately cannot be said to restrain competition."  Jefferson Parish Hosp., 466 U.S. at 11–12.

Moreover, "if each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market," especially if "competing suppliers are free to sell either the entire package or its several

parts."  Id.; see also Northern Pacific Railway Co., 356 U.S. at
7 ("[I]f one of a dozen food stores in a community were to
refuse to sell flour unless the buyer also took sugar it would
hardly tend to restrain competition in sugar if its competitors
were ready and able to sell flour by itself.").  Thus, the
determination of the first element of a per se tying claim
hinges on the existence of separate markets of both the tying
and the tied products.  See Jefferson Parish, 466 U.S. at 21-22.

A.  Separate Products

       To determine whether the tying and the tied products are
distinct, "the Court looks to the character of the demand for
the two items."  Kell v. Am. Capital Strategies, Ltd., 278
F.Supp.2d 156, 161 (D.P.R. 2003); see Eastman Kodak, 504 U.S. at
462 ("[T]here must be sufficient consumer demand so that it is
efficient for a firm to provide service separately from
parts.").  In addition, "The success of a single product defense
ordinarily hinges on observations of actual market practices."
SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp., 188 F.3d
11, 15 (1st Cir. 1999).  In particular, "[i]f evidence shows
that there is significant demand for separate components of what
is alleged to be a single product and the product is in fact
sold in those forms, there is no single product."  Id.  In other
words, a tying arrangement cannot exist unless it can be shown
that there is a sufficient demand for the purchase of the tied

product separate from the tying product in order to "identify a distinct product market in which it is efficient to offer [the tied product] services separately from [the tying product] services."  Jefferson Parish, 466 U.S. at 21-22.

Here, PDFfiller pled facts that demonstrate it is plausible there is a separate product market for the alleged tied product, PTM Software for California EFRE.  The counterclaims and the third-party complaint state that the demand for the tying and the tied product is "not identical."  (Docket Entry # 100, p. 27) (Docket Entry # 101, p. 8).  Moreover, as also stated in the counterclaims and the third-party complaint, "consumers frequently seek out non-CAR PTM Software to edit CAR EFRE, turning to PTM Software providers such as Dotloop, Instanet Solutions, and PDFfiller."  (Docket Entry # 100, p. 27) (Docket Entry # 101, p. 8).  In addition, numerous competitors "do not typically bundle EFRE and PTM Software products."  (Docket Entry # 100, p. 27) (Docket Entry # 101, p. 9).  These allegations are sufficient to avoid a Rule 12(b)(6) dismissal based on the CAR Parties' argument that the tying and the tied products are not two distinct products.

B.  Economic Power to Distort Consumer Choice

The CAR Parties next contend that PDFfiller failed to plead plausible facts that demonstrate that "CAR has market power in the alleged tying market."  (Docket Entry # 122, p. 21) (Docket

Entry # 127, p. 5).  Nor has PDFfiller, according to the CAR

Parties, pled sufficient facts to show "high (or any) barriers

to entry in the alleged market."  (Docket Entry # 122, p. 21)

(Docket Entry # 127, 6).  PDFfiller maintains it alleged

sufficient facts indicating CAR's "extremely high market share

in the tying market, which is sufficient to demonstrate market

power at this stage in the litigation."  (Docket Entry # 123, p.

15).  PDFfiller further contends it is not necessary to allege

high barriers to entry in order to demonstrate market power in

the tying market.  (Docket Entry # 123, p. 15).

     To determine the market power of the seller, "the law draws

a distinction between the exploitation of market power by merely

enhancing the price of the tying product, on the one hand, and

by attempting to impose restraints on competition in the market

for a tied product, on the other."  Jefferson Parish, 466 U.S.

at 14.  More specifically:

> Our cases have concluded that the essential characteristic
> of an invalid tying arrangement lies in the seller's
> exploitation of its control over the tying product to force
> the buyer into the purchase of a tied product that the
> buyer either did not want at all, or might have preferred
> to purchase elsewhere on different terms.  When such
> "forcing" is present, competition on the merits in the
> market for the tied item is restrained and the Sherman Act
> is violated.

Id. at 12.  "Accordingly, we have condemned tying arrangements

when the seller has some special ability—usually called 'market

power' to force a purchaser to do something that he would not do

in a competitive market." Id. at 13-14.  There must be more
than a single purchaser "forced" into buying the tied product
for the "impact on competition . . . to warrant the concern of
antitrust law." Id. at 16; see also Lee v. Life Ins. Co. of
North America, 23 F.3d 14, 16 (1st Cir. 1994) ("'market power'
is the demonstrated ability of a seller to force a purchaser to
do something that he would not do in a competitive market")
(citations omitted).

       Market power may be inferred from the seller's predominate
share of the tying market. Hewlett-Packard Co. v. Boston
Scientific Corp., 77 F.Supp.2d 189, 195 (D. Mass. 1999). "For
pleading purposes, an allegation of market share of 70 percent
has been held to be an adequate basis for an inference of power
in a relevant market." Id. at 195-196 (citations omitted).
Finally, "[w]hen the seller's share of the market is high . . .
the Court has held that the likelihood that market power exists
and is being used to restrain competition in a separate market
is sufficient to make per se condemnation appropriate."
Jefferson Parish, 466 U.S. at 17.

       PDFfiller pled facts to render it plausible that the CAR
Parties' market power in the tying product market is so
substantial that it forces users to purchase the tied product.
See Jefferson Parish, 466 U.S. at 14.  In the counterclaims and
the third-party complaint, PDFfiller alleges that CAR has

substantial market power based on:  CAR's 90% market share of
the tying market; CAR's 150,000 members in California; CAR's
statements that "CAR products are the standard forms used in
nearly every transaction in California"; and that the CAR
Parties "are able to prevent California consumers from using the
PTM Software of their choice" and "force those consumers to pay
significantly higher prices for PTM Software."  (Docket Entry #
100, pp. 21, 23, 27, 30-31) (Docket Entry # 101, pp. 8, 10, 12).

     As set out in the counterclaims and the third-party
complaint, these allegations render it plausible that the CAR
Parties have substantial economic power in the tying product
market and therefore *could* plausibly restrain competition in the
tied product market.  The allegation that CAR possesses 90%
market share of the tying market alone is sufficient to infer
the CAR Parties' economic power in the tying product market at
this stage in the pleadings.  See Hewlett-Packard Co., 77
F.Supp.2d at 195.

C.   Tie Forecloses Substantial Amount Commerce in Market for
Tied Product

     The CAR Parties next argue that, "because PDFfiller is a
competitor in the alleged tied market, it must allege that it
has been wrongfully foreclosed as a competitor, rather than
merely losing sales to a favored rival."  (Docket Entry # 122,
p. 24).  The CAR Parties contend that, "PDFfiller has not

alleged that it has been excluded or eliminated as a competitor, and it even admits that it continues to compete with zipLogix. Nor has it alleged injury to competition." (Docket Entry # 122, p. 24). Conversely, PDFfiller suggests it "satisfied this minimal showing by alleging that Defendants' conduct has excluded a substantial amount of competitors from the tied market." (Docket Entry # 123, p. 22).

To determine if the alleged tie forecloses a substantial amount of commerce in the market for the tied product:

> the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie, for it is unreasonable, per se, to foreclose competitors from any substantial market by a tying arrangement.

Fortner Enterprises, Inc. v. U.S. Steel Corp., 394 U.S. 495, 501 (1969) (citations omitted). Additionally, "the plaintiff must also 'make some showing of actual injury attributable to something the antitrust laws were designed to prevent.'" AVX Corp. v. Cabot Corp., 600 F.Supp.2d 286, 294 (D. Mass. 2009) (quoting Perkins v. Standard Oil Co., 395 U.S. 642, 648 (1969)). To survive a Rule 12(b)(6) motion, the counterclaims and the third-party complaint are sufficient if they demonstrates that "a not insubstantial amount of commerce has been foreclosed as a result of the alleged tying arrangement." Copeca, Inc. v. W. Aviation Servs. Corp., 653 F.Supp.2d 141, 148 (D.P.R. 2009).

Here, as set out in the counterclaims and the third-party complaint, "CAR does not license the use of its EFRE in California to third parties" and, as a result, "consumers that wish to buy CAR EFRE must either join a REALTOR affiliate or purchase zipForm subscription." (Docket Entry # 100, p. 28) (Docket Entry # 101, p. 9). Either option is "significantly more expensive than CAR's competitors in the California EFRE Market, and both options are conditioned on the purchase and use of zipForm." (Docket Entry # 100, p. 28) (Docket Entry # 101, p. 9). The CAR Parties' tying also forces users of CAR EFRE in California to use zipForm with CAR EFRE and "prevents users from using PTM Software that competes with zipForm, even if they are unsatisfied with the quality or price of zipForm." (Docket Entry # 100, p. 29) (Docket Entry # 100, p. 10). Finally, the CAR Parties' conduct "reduce[s] the likelihood of new entrants in the market for PTM Software" and also eliminates the opportunity for competition on the merits because CAR's EFRE products cost "several hundred dollars more than competitors." (Docket Entry # 100, pp. 28-31) (Docket Entry # 101, pp. 9-12).

The counterclaims and the third-party complaint, therefore, adequately allege facts from which it is reasonable to infer that a substantial amount of commerce has been foreclosed as a result of the CAR Parties' alleged tying arrangement. The alleged price discrepancies evidence the plausibility that a

total amount of business - especially in terms of dollar-volume
of lost business for competitors – is foreclosed to competitors
as a result of the CAR Parties' conduct.   In sum, at this stage
in the proceedings and with facts construed in its favor,
PDFfiller pled sufficient facts to render the elements of its
per se tying claim plausible.   The per se tying claim therefore
survives the CAR Parties' Rule 12(b)(6) challenge.[10]

3.   Monopoly and Attempted Monopoly

The CAR Parties next argue that PDFfiller's monopoly and
attempted monopoly claims fail because PDFfiller did not allege
facts "showing any evidence of market power or even indirect
evidence in the form of market share and high entry barriers" in
the alleged relevant market.   (Docket Entry # 122, p. 22)
(Docket Entry # 127, p. 7).   The CAR Parties also assert that
PDFfiller's monopoly and attempted monopoly claims fail because
"PDFfiller has not pled wrongful or anticompetitive conduct by
the CAR Parties."   (Docket Entry # 122, p. 22) (Docket Entry #
127, p. 8).   The CAR Parties suggest "there are no facts alleged
to support any inference that CAR's copyrights are invalid, or
that CAR has not acted in the lawful exercise of its rights as a
copyright owner," and that PDFfiller fails to plead any facts to

---

[10]   Because PDFfiller's per se tying claim survives the Rule
12(b)(6) challenge, it is not necessary to address PDFfiller's
rule of reason argument.

support its allegations of the CAR Parties' "baseless lawsuits." (Docket Entry # 122, p. 23) (Docket Entry # 127, p. 8). Finally, the CAR Parties argue that all claims fail because PDFfiller has not pled facts "sufficient to show not only that it has suffered injury-in-fact, but also that its alleged injury constitutes 'antitrust injury' – that is, 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful.'" (Docket Entry # 122, p. 24) (quoting Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 342 (1990)).

PDFfiller suggests that it pled sufficient facts that, "if proven, would constitute direct evidence of Defendants' monopoly power in the tied market." (Docket Entry # 123, p. 18). PDFfiller maintains that its contention that the CAR Parties charge supracompetitive prices for the tied product is sufficient to constitute "direct evidence of the CAR Parties' monopoly power" in the tied market. (Docket Entry # 123, p. 19) (Docket Entry # 100, pp. 27-28) (Docket Entry # 101, pp. 8-9). PDFfiller further contends that it need not show that the entity offering the tied product is the only entity in its market in order to provide evidence of monopoly power. (Docket Entry # 123, pp. 18-19).

Section two of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize . . . any part of the

trade or commerce among the several States . . ..″  Diaz

Aviation Corp. v. Airport Aviation Servs., Inc., 716 F.3d 256,

265 (1st Cir. 2013); 15 U.S.C. § 2.  The necessary elements of a

monopolization claim are:

> "(1) [p]ossession of monopoly power in the relevant market
> and (2) the willful acquisition or maintenance of that
> power as distinguished from growth or development as a
> consequence of a superior product, business acumen, or
> historic accident."

Id. at 256 (quoting United States v. Grinnell Corp., 384 U.S.

563, 570-71 (1966)); see also In re Asacol Antitrust Litig., 233

F.Supp.3d 247, 266 (D. Mass. 2017).  "In the First Circuit,

courts refer to 'improper methods of acquiring or maintaining

monopoly power as 'exclusionary conduct.'"  In re Asacol, 233

F.Supp.3d at 266 (quoting Town of Concord v. Boston Edison Co.,

915 F.2d 17, 21 (1st Cir. 1990)).  "This means conduct, other

than competition on the merits or restraints reasonably

'necessary' to competition on the merits, that reasonably

appears capable of making a significant contribution to creating

or maintaining monopoly power."  Id. (internal citations

omitted).

The elements of attempted monopolization are "(1) that the

defendant has engaged in predatory or anticompetitive conduct

with (2) a specific intent to monopolize and (3) a dangerous

probability of achieving monopoly power."  Diaz Aviation, 716

F.3d at 265 (citing Spectrum Sports, Inc. v. McQuillan, 506 U.S.

36

447, 456 (1993)).  Attempted monopolization "requires a finding

of specific intent."  In re Asacol, 233 F.Supp.3d at 267.

A.  Monopoly Power

Monopoly power is defined as the "power of controlling

prices or unreasonably restricting competition."  United States

v. E.I. DuPont de Nemours & Co., 351 U.S. 377, 391 (1956).

Simply stated, monopoly power is the "power to control price or

exclude competition."  Id. at 392; see also Abarca Health, LLC

v. PharmPix Corp., 915 F.Supp.2d 210, 218 (D.P.R. 2012)

(monopoly power "is evaluated in light of the 'relevant market'

and 'the defendant's ability to lessen or destroy competition in

that market'") (quoting Coastal Fuels of Puerto Rico, Inc. v.

Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996)).

It is generally determined in one of two ways, the first is

through a showing of supracompetitive prices.  See Diaz

Aviation, 716 F.3d at 265.  "Absent direct proof of

supracompetitive prices, monopoly power is typically proven by

defining a relevant market and showing that the defendant has a

dominant share of that market."  Id.

PDFfiller adequately alleges that the CAR Parties have

monopoly power in the tied product market.  In the counterclaims

and the third-party complaint, PDFfiller states that, "CAR's

EFRE forms are provided as a benefit to members" and

"[m]embership is obtained by joining a local REALTOR affiliate."

(Docket Entry # 100, p. 27) (Docket Entry # 101, p. 8).  The
pleadings further allege that the cost of CAR membership fees
"are in excess of $600 per year" and that "[n]on-members may not
purchase CAR EFRE without first purchasing zipForm," which, in
its most basic form, "costs $849 for an annual license."
(Docket Entry # 100, p. 28) (Docket Entry # 101, p. 8).  As also
stated in the counterclaims and the third-party complaint, CAR's
EFRE competitors offer California EFRE forms for free and also
offer PTM Software "starting at $72 per year" or for free.
(Docket Entry # 100, p. 28) (Docket Entry # 101, p. 9).  The
aforementioned statements sufficiently allege facts showing that
the CAR Parties have monopoly power in the tied product market
through supracompetitive pricing and maintain the ability to
control prices in the tied product market and potentially
exclude competition.

     The CAR Parties suggest that PDFfiller must also plead
facts showing high barriers to entry in the alleged market in
order to satisfy the market power element.  Barriers of entry,
however, is not the requisite standard under First Circuit law
and, while the Ninth Circuit suggests that entry barriers also
demonstrate monopoly power, the First Circuit in Diaz provides
that supracompetitive prices will suffice to show monopoly
power.  See Diaz Aviation, 716 F.3d at 265.

B.  Wrongful or Anticompetitive Conduct

                               38

The CAR Parties next argue that PDFfiller's allegations of CAR's "baseless lawsuits" are insufficient to satisfy wrongful or anticompetitive conduct.  The CAR Parties contend that PDFfiller fails to allege facts that "support any inference that CAR's copyrights are invalid, or that CAR has not acted in the lawful exercise of its rights as a copyright owner" and that, in any event, such allegations of fraudulent lawsuits "must be pled with particularity under Fed. R. Civ. P. 9(b)."  (Docket Entry # 122, p. 23).  PDFfiller maintains, however, that it sufficiently alleged that CAR "engaged in a pattern of objectively baseless litigation, the intent of which" was "to intimidate consumers and competitors from using PTM Software for California EFRE other than zipForm."  (Docket Entry # 123, p. 20).  PDFfiller further points out that "this court has held in no uncertain terms that allegations of sham litigation do not require a heightened pleading standard."  (Docket Entry # 123, p. 20).

To satisfy both the monopoly and the attempted monopoly claims, PDFfiller must show that the CAR Parties engaged in wrongful or anticompetitive conduct.  See In re Asacol, 233 F.Supp.3d at 247.  More specifically, PDFfiller must plead facts sufficient to show that the CAR Parties engaged in conduct designed to maintain, or with the intent to create, monopoly power in the relevant market.  Diaz Aviation, 716 F.3d at 265. Further, anticompetitive means require a showing that is

"distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Wojcieszek v. New England Tel. & Tel. Co., 977 F.Supp. 527, 533 (D. Mass. 1997); see also Hewlett-Packard Co., 77 F.Supp.2d at 197.  "This means conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power."  In re Asacol, 233 F.Supp.3d at 267.  Conduct crosses into the threshold of anticompetitive "'when it obstructs the achievement of competition's basic goals-lower prices, better products, and more efficient production methods.'"  Sullivan v. Nat'l Football League, 34 F.3d 1091, 1097 (1st Cir. 1994) (quoting Town of Concord, Mass. v. Boston Edison Co., 915 F.2d 17, 21-22 (1st Cir. 1990)).  The filing of a lawsuit violates antitrust laws when the lawsuit's primary purpose is not to seek the outcome of the governmental process, but rather to seek the use of the governmental process merely to interfere with the business relationships of a competitor.  Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 51 (1993) ("PRE").

PDFfiller submits that the CAR Parties' use of litigation constitutes anticompetitive conduct.  (Docket Entry # 100) (Docket Entry # 101).  As set forth in the Noerr-Pennington

doctrine, "which arose in antitrust cases under the Sherman Act,
. . . '[t]hose who petition [the] government for redress are
generally immune from antitrust liability.'" Picone v. Shire
PLC, Civil Action No. 16-12396-ADB, 2017 WL 4873506, at *5 (D.
Mass. Oct. 20, 2017) (internal citation omitted).  There are
exceptions to the Noerr-Pennington doctrine, however, the first
dealing with a patent procured by fraud, and the second being
that "immunity does not apply where petitioning the government
'is a mere sham to cover . . . an attempt to interfere directly
with the business relationships of a competitor.'" Crocs, Inc.
v. Effervescent, Inc., 248 F.Supp.3d 1040, 1055 (D. Colo. 017)
(quoting PRE, 508 U.S. at 56).  Thus, "litigation cannot be
deprived of immunity as a sham unless the litigation is
objectively baseless." PRE, 508 U.S. at 51.  Courts describe a
sham as "evidenced by repetitive lawsuits carrying the hallmark
of *insubstantial* claims." Id. at 58 (emphasis added).

   The Supreme Court established a two-prong inquiry of sham
litigation, with the first prong being objective and the second
prong subjective. Id. at 51.  First, "the lawsuit must be
objectively baseless in the sense that no reasonable litigant
could realistically expect success on the merits." Id. at 60.
Second, "the court should focus on whether the baseless lawsuit
conceals an attempt to interfere *directly* with the business
relationships of a competitor, through the use of the

governmental *process*—as opposed to the *outcome* of that process— as an anticompetitive weapon." Id. at 60-61 (internal citations and brackets omitted); see also Advanced Ion Beam Tech., Inc. v. Varian Semiconductor Equip. Assocs., Inc., 721 F.Supp.2d 62, 74- 75 (D. Mass. 2010). An antitrust plaintiff is required "to prove that the defendant lacked probable cause to institute an unsuccessful civil lawsuit and that the defendant pressed the action for an improper, malicious purpose." PRE, 508 U.S. at 62. "Probable cause to institute civil proceedings requires no more than a "reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication." Id. at 62-63.

With respect to the applicability of the heightened pleading standard of Fed. R. Civ. P. 9 ("Rule 9(b)"), "[a]lthough some cases in *other* Circuits have required greater specificity in pleading, the Federal Rules of Civil Procedure *do not contain such a requirement* and the Supreme Court has recently *expressed disapproval* of judicial attempts to heighten pleading requirements in other contexts." Skinder-Strauss Assocs. v. Massachusetts Continuing Legal Educ., Inc., 870 F.Supp. 8, 11 (D. Mass. 1994) (emphasis added). In fact, "There is no heightened pleading requirement for a claim of unfair competition based upon the institution of sham litigation." Honeywell Consumer Prod., Inc. v. Windmere Corp., 993 F.Supp. 22, 24 (D. Mass. 1998). The more rigorous pleading standards of

Rule 9(b) apply only to allegations of fraud or when fraud "lies at the core" of a claim.  Hayduk v. Lanna, 775 F.2d 441, 443 (1st Cir. 1985) (conspiracy to commit fraud falls within Rule 9(b)'s requirements); Enercon v. Global Computer Supplies, Inc., 675 F.Supp.2d 188, 197 (D. Me. 2009) (tracing Hayduk line of cases and concluding that Rule 9(b) did not apply to negligent misrepresentation claim).  Whereas Rule 9(b) may apply to the first exception to the Noerr-Pennington doctrine, i.e., a patent procured by fraud, it does not apply to the second exception, i.e., sham litigation.  See Honeywell, 993 F.Supp. at 24. Simply stated, fraud does not lie at the core of the latter exception, which is the one PDFfiller invokes.  Accordingly, Rule 9(b) does not provide a basis for dismissal.

Turning to the two prongs of sham litigation, the counterclaims and the third-party complaint state that, "CAR has threatened and instituted lawsuits against non-CAR real estate professionals that use CAR EFRE without permission by claiming copyright protection" and that, "on information and belief, these are sham lawsuits, objectively baseless, and subjectively intended to use the judicial process, as opposed to the outcome of that process, as an anticompetitive weapon." (Docket Entry # 100, p. 29) (Docket Entry # 101, p. 10).  The counterclaims and

the third-party complaint identify a number of cases[11] that
either resulted in default judgments for failure to appear or
settled before a decision was rendered on the merits of CAR's
claims.  Taking judicial notice of the dockets in these cases,
none of the cases resulted in a judicial decision on the merits.
See Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990)
("federal courts may take judicial notice of proceedings in
other courts if those proceedings have relevance to the matters
at hand");  see, e.g., Bluetarp Financial, Inc. v. Matrix
Construction Co., Inc., 709 F.3d 72, 78 n.4 (1st Cir. 2013)
(taking judicial notice of related state court cases).

The counterclaims and the third-party complaint further
allege that, "CAR is encouraging or asking its sister state
realtor association to sue PDFfiller" and that "the Texas
Association of Realtors, Inc. sent a cease-and-desist letter to
and filed suit against PDFfiller, making essentially the same
allegations as CAR in the present litigation." (Docket Entry #
100, p. 30) (Docket Entry # 101, pp. 10-11).  The counterclaims
and the third-party complaint elaborate by stating that, "as
with CAR's complaint, those allegations are baseless" and TAR

---

[11] California Association of Realtors v. Zachery Childress, et
al., Case No. 8:11-cv-304, 8:11-cv-1553 (C.D. Cal. 2011);
California Association of Realtors v. Commerce Inn Inc., Case
No. 2:02-cv-251 (C.D. Cal. 2002); California Association of
Realtors v. Equisource Real Estate Inc., et al., Case No. 2:01-
cv-01603 (C.D. Cal. 2001).

"owns an interest in zipForm, and therefore has an interest in assisting CAR's anticompetitive practices through additional sham litigation." (Docket Entry # 100, p. 30) (Docket Entry # 101, p. 11).

Moreover, the counterclaims and the third-party complaint allege that the CAR Parties are using these lawsuits "to prevent competition on the merits between zipForm and competing PTM Software products, including PDFfiller"; "to reduce the likelihood of new entrants in the market for PTM Software"; "to enable the CAR Parties to improperly acquire and maintain market power in the tied market for PTM Software"; and "to acquire, maintain, and/or expand their monopoly power in the market for California EFRE." (Docket Entry # 100, p. 31) (Docket Entry # 101, p. 12). On balance, the allegations in the counterclaims and the third-party complaint sufficiently satisfy both prongs and adequately allege conduct that crosses into the threshold of anticompetitive to withstand the Rule 12(c) motion.

C.   Antitrust Injury

As a final challenge to the monopolization and attempted monopolization claims, the CAR Parties assert that PDFfiller fails to allege facts showing an antitrust injury. The CAR Parties contend that PDFfiller must set out facts that "its alleged injury constitutes 'antitrust injury.'" (Docket Entry # 122). The CAR Parties submit that, "PDFfiller has not alleged

that it has been excluded or eliminated as a competitor[,]" or
"alleged injury to competition." (Docket Entry # 122, p. 25).
PDFfiller maintains that it alleged facts from which an antitrust
injury can be inferred and particularly points to its
allegations that PDFfiller "has been prevented from competing
for the PTM Software business of California EFRE users that are
unsatisfied with zipForm, and as a result has lost sales and
suffered damage to its reputation and goodwill." (Docket Entry
# 123, p. 24) (Docket Entry # 100, pp. 31-33) (Docket Entry #
101, pp. 12-15).

Here, both PDFfiller and the CAR Parties agree (Docket
Entry # 122, p. 24) (Docket Entry # 123, p. 24) that "antitrust
injury is 'injury of the type the antitrust laws were intended
to prevent and that flows from that which makes defendants' acts
unlawful.'" Sterling Merch., Inc. v. Nestle, S.A., 656 F.3d
112, 121 (1st Cir. 2011) (quoting Brunswick Corp. v. Pueblo
Bowl-O-Mat, Inc., 429 U.S. 477, 489, (1977)); see also Atlantic
Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 342
(1990). Moreover, "[p]laintiffs must show not only that they
were injured as a result of the defendant's actions and that
those actions constituted an antitrust violation, but also that
their injury is the type of injury the antitrust violation would
cause *to competition*." Sterling Merch., 656 F.3d at 121
(emphasis in original).

The counterclaims and the third-party complaint allege
that, as a result of the CAR Parties' actions, there has been
antitrust injury in the following ways:  (1) "CAR's unlawful
tying . . . affects a substantial volume of interstate
commerce"; (2) the CAR Parties' "anticompetitive practices"
unreasonably restrained "competition in the relevant market,
which is harmful to consumers by restricting consumer choice and
forcing consumers to pay zipForm's monopoly price in order to be
able to use CAR EFRE"; (3) "users of CAR EFRE in California have
been and continue to be forced to use zipForm with CAR EFRE" and
this conduct excludes "a substantial amount of competing PTM
Software from the California market"; (4) the CAR Parties'
conduct forces "users of CAR EFRE to use zipForm in place of
other PTM Software" which "*harms PDFfiller* and competition in
the market for PTM Software for California EFRE because it
deprives PTM Software competitors, *including PDFFiller*, of the
opportunity to freely compete in the marketplace with the CAR
Parties"; (5) the CAR Parties' pattern of "sham litigation"
intimidates customers "from using competition PTM Software other
than zipForm and reduces "the likelihood of new entrants in the
market for PTM Software"; and (6) "*PDFfiller* has been . . .
injured by the CAR Parties' exclusionary and anticompetitive
practice of depriving users of CAR EFRE of the benefits of
competition, including the freedom to choose among PTM Software

47

offerings such as the PTM Software offered through the PDFfiller website." (Docket Entry # 100, pp. 30-32) (Docket Entry # 101, 11-13) (emphasis added).

Such facts provide a plausible antitrust injury, namely, that PDFfiller was injured as a result of the CAR Parties' actions in a way that constituted an antitrust violation, and that its injury is the type of injury the antitrust violation would cause to competition. In sum, at this stage in the proceedings, counts one and two survive the CAR Parties' Rule 12(b)(6) challenge.

II.  Defendants' Rule 12(c) Motion

PDFfiller seeks to dismiss CAR's chapter 93A claim because the misconduct did not occur "primarily and substantially" in Massachusetts. (Docket Entry # 141). It also maintains that CAR, as a nonprofit corporation, does not engage in "trade or commerce" as required under section 11. (Docket Entry # 142). CAR opposes the Rule 12(c) motion. (Docket Entry # 153).

STANDARD OF REVIEW

A Rule 12(c) motion for judgment on the pleadings "is treated much like a Rule 12(b)(6) motion to dismiss." Perez Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008). Legal conclusions are ignored and, "under Rule 12(c), courts need not credit conclusory statements or merely subjective characterizations." Class v. Commonwealth of Puerto Rico, 309

F.Supp.2d 235, 236 (D.P.R. 2004); see Soto-Torres v. Fraticelli,
654 F.3d 153, 158-159 (1st Cir. 2011).

A Rule 12(c) "motion calls for an assessment of the merits
of the case at an embryonic stage, [so] the court must view the
facts contained in the pleadings in the light most favorable to
the nonmovant and draw all reasonable inferences therefrom" in
the nonmovant's favor.  R.G. Financial Corp. v. Vergara-Nunez,
446 F.3d 178, 182 (1st Cir. 2006).  Accordingly, "There is no
resolution of contested facts in connection with a Rule 12(c)
motion:  a court may enter judgment on the pleadings only if the
properly considered facts conclusively establish the movant's
point."  Id.  In the event "a court grants a . . . Rule 12(c)
motion based on an affirmative defense, the facts establishing
that defense must:  (1) be 'definitively ascertainable from the
complaint and other allowable sources of information,' and (2)
'suffice to establish the affirmative defense with certitude.'"
Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 324 (1st
Cir. 2008).

Subject to certain narrow exceptions and absent a
conversion of the Rule 12(c) motion to a summary judgment motion
under the procedure set forth in Rule 12(d), this court's review
is confined to the complaint, the answer, and any attached
exhibits.  Fed. R. Civ. P. 12(d); see Fed. R. Civ. P. 10(c) ("a
written instrument that is an exhibit to a pleading is part of

the pleading for all purposes").  In evaluating a Rule 12(c)

motion, a court may supplement the complaint with "facts of

which judicial notice may be taken." R.G. Fin. Corp. v.

Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2016).  For purposes

of the Rule 12(c) challenge to the chapter 93A claim, the facts

are as follows.

FACTUAL BACKGROUND

CAR is a "California not-for-profit corporation with its

principal place of business located in Los Angeles, California."

(Docket Entry # 1, p. 2).  It is not registered to do business

in Massachusetts.  (Docket Entry # 143-1).[12]  PDFfiller is "a

Massachusetts corporation with its principal place of business

located at 167 Corey Road" in "Brighton, Massachusetts."

(Docket Entry # 1, p. 2).  Defendant Vandim Yasinovsky

("Yasinovsky") is "the CEO and Secretary of PDFfiller,"

"operates the website, pdffiller.com," and is "an individual

domiciled in the Commonwealth of Massachusetts."  (Docket Entry

# 1, p. 2).  Defendant Boris Shakhnovich ("Shakhnovich") is the

"President, Treasurer, and Director of PDFfiller," "operates the

---

[12] This court takes judicial notice of the screenshot of the
business entity search for CAR that PDFfiller conducted through
the publically available search tool on the corporations
division of the Secretary of the Commonwealth of Massachusetts'
website.  PDFfiller filed the screenshot.  (Docket Entry # 143-
1); see Hadley v. Chrysler Group LLC, 2014 WL 988962, at *2
(E.D.Mich. Mar. 13, 2014). ("[c]ourt can take judicial notice
and consider documents posted on a government website").

website, pdffiller.com," and is "an individual domiciled in the
Commonwealth of Massachusetts." (Docket Entry # 1, p. 3).
Drawing reasonable inferences in favor of CAR, Yasinovsky and
Shakhnovich both operate the website from Massachusetts where
they are domiciled and where PDFfiller has its principal place
of business and office in Brighton. The Massachusetts office is
"a focus of the unauthorized activities." (Docket Entry # 1, p.
4).

CAR was "founded in 1905 and is a non-profit trade
association" that represents approximately 170,000 real estate
professionals in California. (Docket Entry # 1, p. 4). CAR
created and developed programs and services to assist its
members in the real estate field. (Docket Entry # 1, p. 4).
"Over many years, CAR[13] has created and maintained" the CAR
Library, which is "an extensive resource library of specialized
and copyrighted business works created and designed to cover
essentially all aspects of the types of residential and
commercial real estate purchase, sales, and leasing transactions
in which CAR's members engage." (Docket Entry # 1, p. 4). The
CAR name and logo are registered trademarks. (Docket Entry # 1,
p. 4).

---

[13] The complaint refers to CAR as C.A.R. For consistency, this
court refers to CAR without including the periods.

CAR restricts the access to the CAR Library to "paid members and other licensees." (Docket Entry # 1, ¶ 31). "Electronic versions of the CAR Library are only available via software" called zipForm, which is offered by zipLogix. (Docket Entry # 1, p. 5). [Z]iplogix is managed by REBS, "a wholly-owned subsidiary of CAR." (Docket Entry # 1, p. 5).

"REBS is licensed to provide the works in the CAR Library to CAR members and other non-member real estate professionals for the benefit of CAR." (Docket Entry # 1, p. 5). Access to certain works in the CAR Library "is also offered to CAR's paid members and other licensees for sale through the CAR Business Solutions online store operated by REBS." (Docket Entry # 1, p. 5). CAR's members gain access to the CAR Library "as a member benefit." (Docket Entry # 1, p. 5). "Access to the CAR Library," however, "is restricted to CAR's paid members and other licensees." (Docket Entry # 1, p. 5). Non-member real estate professionals are able to purchase "an annual license to access the CAR Library through zipForm" for a fee between $799 and $999 per year. (Docket Entry # 1, p. 5). Users must be licensed zipForm users in order to "access and use the software" that enables them "to fill in client transaction details and create different types of documents with different purposes and functions, as needed, and then download and send completed

documents for use in a real estate transaction." (Docket Entry # 1, p. 6).

PDFfiller's website is "designed to do the same thing," meaning, it allows users to access software that lets them fill in transaction details, create different types of documents, and download and send completed documents. (Docket Entry # 1, p. 6). As elaborated below, PDFfiller's website "directly mimics the functionality of zipForm concerning numerous works from the CAR Library." (Docket Entry # 1, p. 6).

Licensed and registered zipForm users are subject to an end-user license agreement for zipLogix products and services ("the zipLogix EULA"). (Docket Entry # 1, p. 6). The zipLogix EULA prohibits "the removal or alteration of any trademark or copyright notices" and also prohibits the "reproduction of blank documents from within zipForm in any file format or representation," including PDF, "except as expressly permitted in the zipLogix EULA." (Docket Entry # 1, p. 7). The zipLogix EULA also states that blank or partially blank CAR forms "may not be printed or exported" and that "use of CAR works other than as expressly licensed in prohibited." (Docket Entry # 1, p. 7).

CAR's copyrighted works "may only be downloaded from zipForm" and, once completed by the licensed user, used only "for the user's real estate transaction." (Docket Entry # 1, p.

7).  Licensed zipForm users are able to export completed works
in PDF format.  (Docket Entry # 1, p. 7).  "[T]the PDF
versions," however, "are 'locked' by means of a password
generated by zipForm and may not be altered or manipulated
outside zipForm."  (Docket Entry # 1, p. 7).  [Z]ipForm users
are "expressly advised when they email a filled out PDF document
that the zipLogix EULA 'prohibits the modification of
documents.'"  (Docket Entry # 1, p. 7).  The zipLogix EULA
likewise bars "the printing, reproducing, or displaying on the
Internet any blank or partially blank documents available
through zipForm."  (Docket Entry # 1, p. 7).

     The CAR Library "reflects many original and creative
copyrighted" CAR works.  (Docket Entry # 1, p. 8).  There are 64
CAR copyrighted works reproduced, distributed, or used, i.e.,
purportedly infringed, through the PDFfiller website.  (Docket
Entry # 1, p. 8).  Each work bears a copyright notice as well as
CAR's trade name and logo.  (Docket Entry # 1, pp. 8-9).

     Yasinovsky and Shakhnovich operate the PDFfiller website in
Massachusetts.  (Docket Entry # 1, pp. 1-3).  The website mimics
the functionality of zipForm and provides the basis of the
purported misconduct by PDFfiller, Yasinovsky, and Shakhnovich.
(Docket Entry # 1, pp. 6, 9-13).  Through the website, PDFfiller
allows registered and subscribing users "to upload forms and
other documents to their accounts on the PDFfiller Website."

(Docket Entry # 1, p. 9).  Users can also "convert the uploaded documents into stock forms in PDF format" and then fill out the forms or documents "in a fillable PDF document."  (Docket Entry # 1, p. 9).  PDFfiller's website allows users "to save and maintain the electronic forms created from the uploaded content on the PDFfiller Website," which users can complete, repeatedly use, "email[] to any email address, or otherwise export[]." (Docket Entry # 1, p. 9).  PDFfiller "designed and maintained" its website and software in order to "bypass the password lock on native CAR documents."  (Docket Entry # 1, p. 9).  PDFfiller also designed and maintained the website and software "to modify the completed documents exported from the CAR Library by converting a completed, locked file into an unlocked and fillable PDF."  (Docket Entry # 1, p. 9).  These fillable PDF documents exported from the CAR Library are then "maintained as part of the PDFfiller Website user's personal account and the PDFfiller Website database."  (Docket Entry # 1, p. 9). PDFfiller also created "a private database of fillable PDF forms and business documents derived from the documents users have uploaded to the PDFfiller Website and other forms" as well as other documents collected by PDFfiller.  (Docket Entry # 1, p. 10).

PDFfiller markets to the general public and sells subscriptions to use its "website and access its database of

documents and forms." (Docket Entry # 1, p. 10). PDFfiller's
users pay for the ability to: (1) "access and search the
database of forms and documents maintained by" PDFfiller; (2)
download "forms and documents to their accounts"; and (3) "use
the PDFfiller Website to create and maintain" documents like
fillable PDF documents, "which users can then use, email,
download, or otherwise export from the PDFfiller Website."
(Docket Entry # 1, p. 10). PDFfiller additionally sells "the
newly created unlocked, reusable, and fillable PDFs maintained
as part of" its website's database in a "form identical to CAR
works" that are made available only through zipForm, "including
all of CAR's content, trademarked name and logo, and CAR's
copyright designations." (Docket Entry # 1, p. 10).

Without CAR's permission, PDFfiller, a Massachusetts
corporation located in Massachusetts with employees in
Massachusetts and the Ukraine, along with Yasinovsky and
Shakhnovich, both domiciled in Massachusetts, created and sold
"fillable PDFs identical to" CAR's works, which are "available
only through zipForm." (Docket Entry # 1, p. 10). They also
obtained and sold "numerous copyrighted works from the CAR
Library" on the searchable PDFfiller database. (Docket Entry #
1, p. 10). PDFfiller markets its product and services by
discussing on its website "the number of times users have
downloaded a particular work" and by providing a running total

of this statistic on its website.  (Docket Entry # 1, P. 10).

For example, PDFfiller's website, when searched for the terms

"CAR form rpa ca," returned results that "the 'California

Residential Purchase Agreement and Joint Escrow Instructions'

work has been filled out 89,471 times."  (Docket Entry # 1, p.

11).

PDFfiller also "engaged in search engine optimization

techniques."  (Docket Entry # 1, p. 11).  The techniques include

"making the titles of numerous CAR copyrighted works" searchable

in its database through search engines "such as Google," and

ensuring that "links to the PDFfiller Website also appear at the

top of the list or near the top of the list of unpaid search

results."  (Docket Entry # 1, p. 11).  In Massachusetts,

PDFfiller has "over 15 full time employees" who are dedicated to

"marketing and selling content including the Infringed Works"

through methods such as "search engine optimization, Google and

other search engine advertising, website analytics, and other

strategic and state of the art techniques for targeting the

public."  (Docket Entry # 1, p. 12).  These employees in

Massachusetts use these methods to target the public, "including

California real estate licensees," home buyers, and sellers, who

are prospective customers of CAR and prospective clients of

CAR's members.  (Docket Entry # 1, p. 12).  In the Ukraine,

PDFfiller "has over 40 full time employees . . . dedicated to

writing and maintaining software, website analytics, data mining, and maintaining the operation of the PDFfiller Website and business."  (Docket Entry # 1, p. 12).

PDFfiller maintained, marketed, and sold a number of CAR's works to the public, all of which "contain express reference to CAR's copyright registration" that "forbids the unauthorized distribution, display and reproduction of the form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats."  (Docket Entry # 1, pp. 8, 12) (Docket Entry # 1-2).  Each of CAR's works maintained, marketed, and sold to the public via PDFfiller's website also "contain express reference to the trademarked name and logo of CAR by stating 'California Association of Realtors®, Inc.' next to CAR's logo."  (Docket Entry # 1, p. 13).

CAR identifies the following purported misconduct in the complaint:  "republishing the CAR works in their entirety on the PDFfiller searchable database"; "creating and selling unlocked, reusable and fillable PDF forms copied and derived from the CAR works in their entirety on the PDFfiller searchable database"; and "marketing, advertising, offering to sell[,] and selling the works from the CAR Library, bearing Plaintiff's trademarked name and logo, to the public through the PDFfiller Website."  (Docket Entry # 1, p. 13).

Finally, CAR sent, and all defendants received, notices to "cease and desist from further sale and use of [sic] all documents bearing CAR's copyright notices and CAR's trademarks." (Docket Entry # 1, p. 13).   Defendants, however, have not removed any of the works in question from PDFfiller's website. (Docket Entry # 1, p. 13).

DISCUSSION

In seeking to dismiss the section 11 chapter 93A claim, defendants first maintain that the conduct did not occur "'primarily and substantially' within the Commonwealth." (Docket Entry # 142, p. 5) (quoting section 11).   According to defendants, the harm or injury took place exclusively in California, no wrongdoing occurred in Massachusetts, and the "'center of gravity' . . . does not rest in Massachusetts." (Docket Entry # 142, p. 7).   Second, they submit that:   (1) CAR, as a nonprofit corporation, did not engage in "trade or commerce"; and (2) section 1(b) of chapter 93A requires the "trade or commerce" to "directly or indirectly affect[] the people of this commonwealth."   (Docket Entry # 142, p. 13).

CAR points out that defendants have the burden of proof to show "'with certitude'" that the "'transactions and actions did not occur primarily and substantially within the commonwealth.'" (Docket Entry # 153) (quoting <u>Gray v. Evercore Restructuring LLC</u>, 544 F.3d at 324, and section 11).   CAR further maintains

that the facts in the complaint sufficiently show that the misconduct occurred in Massachusetts and the center of gravity giving "'rise to the claim is primarily and substantially within the Commonwealth.'"  (Docket Entry # 153) (quoting Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 781 N.E.2d 787, 788-99 (Mass. 2003)).  CAR additionally contends that its status as a nonprofit corporation is not dispositive of whether it engaged in "trade or commerce" under section 11 and the fact-specific nature of the inquiry precludes a Rule 12(c) dismissal. (Docket Entry # 153).

I.   Primarily and Substantially in Massachusetts

Section 11 precludes relief "unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth."  Mass. Gen. Laws ch. 93A, § 11.  The underlying burden of proof is on "the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth," i.e., defendants.  Mass. Gen. Laws ch. 93A, § 11.

The applicable analysis considers the facts "'in the context of the entire § 11 claim'" and then determines "'whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.'" Sonoran Scanners, Inc. v. Perkinelmer, Inc., 585 F.3d 535, 546

(1st Cir. 2009) (quoting Kuwaiti Danish Computer Corp. v. Digital Equip. Co., 781 N.E.2d at 799).  Furthermore, "[t]he center of gravity analysis examines 'actionable conduct as opposed to conduct that is neither unfair nor deceptive.'" Controlled Kinematics, Inc. v. Novanta Corp., Civil Action No. 17-11029-ADB, 2017 WL 5892200, at *3 (D. Mass. Nov. 29, 2017); see Kuwaiti Danish Computer Corp. v. Digital Equip. Co., 781 N.E.2d at 800 (because "[t]here was nothing unfair or deceptive about" corporate policies adopted and applied in Massachusetts, they "cannot be considered" regarding whether "wrongful conduct occurred 'primarily and substantially' in Massachusetts"); accord Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 236 (1st Cir. 2003) (noting that "defendants' actionable conduct occurred primarily in Michigan" and concluding that center of gravity "occurred primarily outside the Commonwealth").

No one factor predominates the analysis in every case "because of a tendency to shift the focus of the inquiry away from the purpose and scope of [chapter] 93A." Kuwaiti Danish Computer Corp. v. Digital Equip. Co., 781 N.E.2d at 799; accord In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 194 (1st Cir. 2009) (inquiry is "'fact intensive'" with focus on "'purpose and scope' of Chapter 93A").  Moreover, the significance and weight of factors in "one case may be

nonexistent in another" case such that the inquiry is not
grounded on "any precise formula" and is "unique to each case."
Kuwaiti Danish Computer Corp. v. Digital Equip. Co., 781 N.E.2d
at 798; In re Pharm. Indus. Average Wholesale Price Litig., 582
F.3d at 194.  Hence, it may be appropriate to decide a case
based on one instance of misconduct in one jurisdiction when
that misconduct has a greater significance or impact on the case
as a whole rather than on "a multiplicity of instances of
misconduct in another jurisdiction."  Kuwaiti Danish Computer
Corp. v. Digital Equip. Co., 781 N.E.2d at 798-799, 799 n.14.
Depending upon each unique case, "[t]he situs of the loss," id.
at 798 n.13, the locus of the misconduct, and the location where
the plaintiff received and acted upon the unfair or deceptive
act or practice may guide the analysis.  See Controlled
Kinematics, Inc. v. Novanta Corp., 2017 WL 5892200, at *4; see
also Kuwaiti Danish Computer Corp. v. Digital Equip. Co., 781
N.E.2d at 799.

     In the case at bar, a significant amount of the misconduct
of marketing and selling the copyrighted and trademarked works
through search engine optimization took place in Massachusetts.
Fifteen PDFfiller employees in Massachusetts worked full time in
selling and marketing the purportedly infringed works.  Whereas
40 full-time employees in Ukraine worked on data mining, website
analytics, and maintaining the website, Yasinovsky, the chief

executive officer, and Shakhnovich, the president, both
domiciled in Massachusetts, worked in PDFfiller's Massachusetts
office operating the website.[14]  See, e.g., Controlled
Kinematics, Inc. v. Novanta Corp., 2017 WL 5892200, at *5
(section 11 claim based on "actions of Defendant's senior
employees in Massachusetts" where practice of withholding
commissions "was developed by senior company officials" survived
Rule 12(b)(6) challenge).  Reasonable inferences demonstrate
that their activities operating the website in Massachusetts
involved extensive misconduct in Massachusetts, including
approving and designing the website to allow PDFfiller
subscribers to export locked, copyrighted documents from the CAR
Library and convert them to unlocked, fillable PDF documents in
their personal PDFfiller accounts.  Indeed, the website's
database contains at least 64 separate copyrighted works.

Reasonable inferences also permit a finding that Yasinovsky
and Shakhnovich operated the website in Massachusetts by, inter
alia, allowing its users to save, maintain, download, and email
proprietary documents obtained and converted from the CAR
Library to their personal PDFfiller accounts without CAR's
authorization.  As further stated in the complaint, the website

---

[14]  As previously noted, the above finding is made by drawing
reasonable inferences from the facts in the complaint in CAR's
favor.

allows the unauthorized activities of unlocking the CAR Library
of documents and making CAR's intellectual property, including
its licensed and registered zipForms, available to the public
for copying and use.  The foregoing is sufficient to avoid a
Rule 12(c) dismissal even under the more defendant-favorable
standard applicable in the absence of an affirmative defense.

Defendants' remaining arguments are not convincing.
Acknowledging that a number of cases in this district deny Rule
12(b)(6) motions due to language in Kuwaiti that "[s]ection 11
suggests" the court should determine the center of gravity
"after making findings of fact," Kuwaiti, 781 N.E.2d at 799;
see, e.g., Workgroup Tech. Corp. v. MGM Grand Hotel, LLC, 246
F.Supp.2d 102, 118 (D. Mass. 2003), defendants distinguish these
cases as "involve[ing] allegations that the plaintiff was
located in and suffered an injury in Massachusetts." (Docket
Entry # 142, n.3) (citing Bruno Intl. Ltd. v. Vicor Corp., Civil
Action No. 14-10037-DPW, 2015 WL 5447652, at *18 (D. Mass. Sept.
16, 2015)).  As explained by the court in Bruno, courts in this
district show a reluctance to allow motions to dismiss and
reserve "the Kuwaiti assessment for after the factual record has
been developed" when "the plaintiff has alleged that it is
located in and claims some injury in Massachusetts."  Bruno
Intl. Ltd. v. Vicor Corp., 2015 WL 5447652, at *18 (collecting
cases); see, e.g., Guest-Tek Interactive Ent. Inc. v. Pullen,

731 F.Supp.2d 80, 92 (D. Mass. 2010).  Defendants reason that
these cases are consistent with cases dismissing section 11
claims when an out-of-state plaintiff, such as CAR, "fails to
allege sufficient harm or injury within Massachusetts."  (Docket
Entry # 142).  Defendants accurately point out that CAR is a
California corporation with a principal place of business in
California and is not registered to do business in
Massachusetts.  (Docket Entry # 1, ¶¶ 7, 23) (Docket Entry #
143-1).

The <u>Kuwaiti</u> center of gravity analysis, however, eschews
reliance on any one factor, such as the situs of the loss or the
location of the plaintiff.  <u>See</u> <u>Kuwaiti Danish Computer Corp. v.
Digital Equip. Co.</u>, 781 N.E.2d at 799 (analysis "should not be
based on any one factor or factors").  Rather, the focus is
appropriately placed on the unique facts in the Rule 12(c)
record in the context of the entire section 11 claim.  <u>See
generally</u> <u>id.</u> at 798-799.  Those facts and reasonable inferences
show that a significant portion of the misconduct took place in
Massachusetts thereby providing a sufficient basis to deny the
Rule 12(c) motion.  <u>See</u>, <u>e.g.</u>, <u>Controlled Kinematics, Inc. v.
Novanta Corp.</u>, 2017 WL 5892200, at *5 (denying motion to dismiss
section 11 claim brought by out-of-state plaintiff injured in
California against Michigan corporation with principal place of
business in Massachusetts because complaint referenced actions

that took place in Massachusetts); see Fishman v. John Hancock
Life Ins. Co., Civil Action No. 13-12166-LTS, 2014 WL 1326989,
at *3 (D. Mass. Mar. 27, 2014) (out-of-state plaintiffs' section
11 suit for nonpayment of commissions against Massachusetts
company alleging failure to supervise general agents and respond
to reports in Massachusetts warranted denying Rule 12(b)(6)
motion).  Indeed, the court in Kinematics rejected an argument
similar to defendants' argument and determined that the
allegations indicating "that Defendant committed the misconduct
in Massachusetts" were sufficient to avoid a Rule 12(b)(6)
dismissal.  Id. at *4-5.

The Weber case relied on by defendants (Docket Entry # 142,
p. 10) is distinguishable because the misconduct did not occur
in Massachusetts.  See Weber v. Sanborn, 502 F.Supp.2d 197, 199
(D. Mass. 2007) (events giving "rise to this lawsuit are
centered around the planning and development of property in New
Hampshire, by New Hampshire and New Jersey residents and/or
business entities, to 'bring'" stadium to New Hampshire).  CAR
aptly distinguishes two other cases cited by defendants as
relying on a three-factor test rejected in Kuwaiti, 781 N.E.2d
at 798-799.  (Docket Entry # 153, n.2).

Defendants additionally argue that the contacts of the
competing jurisdictions are approximately in balance which leads
to a determination that the conduct did not occur primarily in

Massachusetts.  (Docket Entry # 142, pp. 11-12).  It is true

that "Kuwaiti Danish did not retreat from the proposition that,

if the significant contacts of the competing jurisdictions are

approximately in the balance, the conduct in question cannot be

said to have occurred primarily and substantially in

Massachusetts."  Uncle Henry's Inc. v. Plaut Consulting Co.,

Inc., 399 F.3d 33, 45 (1st Cir. 2005).  Drawing reasonable

inferences and viewing the record in CAR's favor, however, the

competing jurisdictions are not in approximate balance but,

rather, weigh in favor of Massachusetts when viewed under a Rule

12(c) standard.  Coupled with the purpose of chapter 93A "'to

encourage more equitable behavior in the marketplace and impose

liability on persons seeking to profit from unfair practices,'"

defendants fail to satisfy their burden on the primarily and

substantially issue to warrant a Rule 12(c) dismissal.

## II.  Trade or Commerce

Defendants next maintain that CAR, "as a not-for-profit

corporation," does not meet chapter 93A's "trade or commerce"

requirement.  (Docket Entry # 142).  CAR submits that its status

as a nonprofit corporation is not dispositive and that

PDFfiller's use of CAR's trademarks to sell CAR forms on its

website is actionable.  (Docket Entry # 153).

In addition to a commercial transaction, section 11

requires, inter alia, a finding that CAR was "engaged in 'trade

or commerce,' and therefore acting in a 'business context.'"
Linkage Corp. v. Trustees of Boston University, 679 N.E.2d 191,
206 (Mass. 1997) (sections 2(a) and 11 "requires a dual
inquiry," first, whether "interaction is 'commercial' in nature,
and second, whether the parties were both engaged in 'trade or
commerce,' and therefore acting in a 'business context'");
accord Selmark Associates, Inc. v. Ehrlich, 5 N.E.3d 923, 942
(Mass. 2014); States Resources Corp. v. The Architectural Team,
Inc., 433 F.3d 73, 84 (1st Cir. 2005).  An entity's "nonprofit
status is not dispositive" of whether it was engaged in trade or
commerce.  Kunelius v. Town of Stow, 588 F.3d 1, 17 (1st Cir.
2009); accord Linkage Corp. v. Trustees of Boston University,
679 N.E.2d. 207.  In applying the "'business context'" test, the
court assesses "'the nature of the transaction, the character of
the parties involved, and the activities engaged in by the
parties'" as well as "'[o]ther relevant factors.'"  Kraft Power
Corp. v. Merrill, 981 N.E.2d 671, 683 n.13 (Mass. 2013);
Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 259 (Mass.
2008); Begelfer v. Najarian, 409 N.E.2d 167, 176 (Mass. 1980).

CAR is a nonprofit trade association comprised of an
estimated 170,000 California real estate professionals which
promotes real estate services for its members.  (Docket Entry #
1, ¶¶ 23, 24).  PDFfiller, in turn, sells subscriptions of its
services to the public.  (Docket Entry # 1, ¶ 71).  In

particular, PDFfiller's users pay to obtain access to the
company's database of forms, including CAR's copyrighted forms.
They also download forms to their accounts and use the website
to "create and maintain such documents as fillable" PDF forms.
(Docket Entry # 1, ¶ 66).  CAR restricts access to the CAR
Library and its locked forms to "paid members and other
licensees." (Docket Entry # 1, p. 5).  CAR also sells annual
licenses to access the CAR Library and obtain access to its
locked forms for $799 to $999.  PDFfiller's website shows that
users filled out CAR's copyrighted residential purchase
agreement and joint escrow instructions 89,471 times.  (Docket
Entry # 1, ¶ 70) (Docket Entry # 1-2, p. 2).

    CAR identifies the transactions at issue as involving
PDFfiller's use of CAR's copyrighted works "to sell ripped off
copies" of CAR forms on PDFfiller's website without CAR's
permission.  (Docket Entry # 153, p. 9).  Here, construing the
record in CAR's favor, CAR charged for its services or included
the services as a membership benefit for "paid members."  See
Linkage Corp. v. Trustees of Boston University, 679 N.E.2d. at
208 (paraphrasing Planned Parenthood Federation of America, Inc.
v. Problem Pregnancy of Worcester, Inc., 498 N.E.2d 1044, 1052
(Mass. 1986), that charitable entity did not charge for its
services as showing it was beyond reach of chapter 93A).
PDFfiller also charged website users for its services.  It is

also plausible that CAR's motivations (as well as PDFfiller's motivations) for charging membership fees or other fees to access and use the copyrighted forms were financial, namely, to obtain profits for the corporation, and that CAR viewed PDFfiller's activities of allowing subscribers to access and use fillable CAR forms as reducing that profit. See Klairmont v. Gainsboro Restaurant, Inc., 987 N.E.2d 1247, 1256 (2013) ("judge was permitted to infer that the defendants had a profit-seeking motive in constructing and maintaining the hazardous staircase in the context of their commercial enterprise, an enterprise that Jacob patronized as a paying customer").  It is also plausible that the nature of the transactions are business related.  Finally, the transactions were not isolated, see Begelfer v. Najarian, 409 N.E.2d at 176, or incidental to CAR's business.  See Linkage Corp. v. Trustees of Boston University, 679 N.E.2d. at 208.  Accordingly, the chapter 93A claim is not subject to dismissal on the basis that CAR was not engaged in trade or commerce.

     As a final matter, defendants assert that the "indirectly or directly" language in section 1(b) precludes the section 11 claim because CAR fails to allege any connection to Massachusetts that impacts Massachusetts citizens.  Section 1(b) defines "'trade' and 'commerce'" and states, in part, that the term "shall include any trade or commerce directly or indirectly

70

affecting the people of this commonwealth."[15]   Mass. Gen. Laws

ch. 93A, § 1(b).   The language "is of minimal utility in

construing" the trade or commerce phrase because it "merely

'recites certain activities which are included within those

terms and concludes by incorporating . . . "any trade or

commerce directly or indirectly affecting the people of this

commonwealth."'"   Lantner v. Carson, 373 N.E.2d 973, 976 n.4

(Mass. 1978).   The language in section 11, which depicts the

conduct of the person filing suit, i.e., CAR, as engaging in

"*any* trade or commerce," is undeniably broad.   Mass. Gen. Laws

ch. 93A, § 11.   Furthermore, courts interpret this language as

restricting "trade or commerce" to transactions that are not

private in nature.   See Gannett v. Lowell, 450 N.E.2d 1121, 1124

(Mass. App. Ct. 1983); Newton v. Moffie, 434 N.E.2d 656, 659

(Mass. App. Ct. 1982).   Thus, the conduct of "administering the

estate" in Gannett did not constitute "trade or commerce

---

[15]   In full, the definition reads as follows:

> (b) "Trade" and "commerce" shall include the advertising,
> the offering for sale, rent or lease, the sale, rent, lease
> or distribution of any services and any property, tangible
> or intangible, real, personal or mixed, any security as
> defined in subparagraph (k) of section four hundred and one
> of chapter one hundred and ten A and any contract of sale
> of a commodity for future delivery, and any other article,
> commodity, or thing of value wherever situate, and shall
> include any trade or commerce directly or indirectly
> affecting the people of this commonwealth.

Mass. Gen. L. ch. 1(b).

'directly or indirectly affecting the people of this Commonwealth'" because section 11 "'is not available where the transaction is strictly private in nature and is no way undertaken in the ordinary course of a trade or business.'" Gannett v. Lowell, 450 N.E.2d at 1124.  Likewise, the settlement of a dispute over a note in Newton did not "constitute[] trade or commerce 'directly or indirectly affecting the people of this commonwealth,' within the meaning of § 1(b)" because section "11 was not enacted to 'provide an additional remedy for private wrongs which do not'" affect the "'public generally.'"  Newton v. Moffie, 434 N.E.2d at 659.  Moreover, the "directly or indirectly affecting the people of the commonwealth" language "was not intended . . . to create a separate element of the cause of action."  Id. (dicta); see Lantner v. Carson, 373 N.E.2d at 976 n.4.

Here, CAR's conduct is public as opposed to private.  In any event, solely for purposes of the Rule 12(c) motion, this court deems it plausible that CAR engages in conduct that indirectly affects Massachusetts residents.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[16] that CAR's motion to dismiss the amended

---

[16]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report

counterclaims and the third-party complaint (Docket Entry # 121)
and defendants' partial motion for judgment on the pleadings
(Docket Entry # 141) be **DENIED**.  This court will conduct a
status conference on March 14, 2018, at 2:00 p.m. to address the
discovery schedule for the antitrust claims.

 /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

and Recommendation to which objection is made and the basis for
such objection should be included.  See Fed. R. Civ. P. 72(b).
Any party may respond to another party's objections within 14
days after service of the objections.  Failure to file
objections within the specified time waives the right to appeal
the order.